## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

**INTERNATIONAL JUNIOR COLLEGE OF BUSINESS AND TECHNOLOGY, INC.**, *et al.*,

      Plaintiffs,

      v.

**ARNE DUNCAN**, *Secretary of the United States Department of Education, in his official capacity*,

      Defendant.

Civil No. 11-2257 (BJM)

## OPINION AND ORDER

International Junior College of Business and Technology, Inc. *d/b/a* International Junior College and a related institution[1] sued the Secretary of the U.S. Department of Education ("Department") in his official capacity seeking judicial review of agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* International presented four causes of action, generally centered on the Secretary's handling of its institutional eligibility to provide student grants under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 *et seq.*, and particularly the Secretary's order requiring it to repay $1.3 million in Title IV student aid. Docket No. 1 ("Compl.").

The Secretary filed the administrative record from the Office of Hearings and Appeals Docket No. 07-52-SA (Docket No. 26, "R."), along with a record supplement (Docket No. 38-1, "Supp."). Each side now moves for summary judgment, and has opposed the other.[2] Docket Nos. 64, 65, 66 ("Def. Mem."), 73, 76 ("Pl. Mem."), and 81

---

[1] Although the related institution is a co-plaintiff, its conduct and treatment are not squarely at issue in this case. For ease of discussion, this opinion refers only to "International," even though both entities remain plaintiffs at this time.

[2] International also moved for oral argument, which the Secretary did not join. Docket Nos. 75, 84. Although the case involves a complex timeline of events, the parties' numerous

("Def. Opp."). The Secretary's motion for summary judgment is **GRANTED**, and International's motion for summary judgment is **DENIED**.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But the familiar summary judgment framework "has a special twist in the administrative law context" because "the APA standard affords great deference to agency decisionmaking," and presumes that agency action is valid. *Assoc'd Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). Agency action will be overturned "if it is arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or otherwise not in accordance with the law." *Craker v. DEA*, 714 F.3d 17, 26 (1st Cir. 2013) (citing 5 U.S.C. § 706(2)(A), (E)). A court "may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions." *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009).

Generally, agency action will be deemed arbitrary or capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As to an agency's findings of fact, "[s]ubstantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

---

briefings, statements of facts, and the administrative record provide sufficient detail for the court to rule on parties' motions.

When reviewing a federal agency's interpretation of a statute it administers, courts follow a two-step analysis. "First, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue,'" and if so, "'give effect to the unambiguously expressed intent of Congress.'" *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1868 (2013) (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). But "if the statute is silent or ambiguous" on the matter, then the court need only determine "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Moreover, an agency's interpretation of its own regulations is of "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting various cases). The agency's interpretation is entitled to deference unless an "'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" *Id.* (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

## BACKGROUND

This summary of the administrative record is guided by the parties' Local Rule 56 statements of uncontested fact. *See* Docket Nos. 65, 72, 78, and 79.[3] I note that both sides attempt to shoehorn questions of statutory interpretation and other argumentation into the local rule's fact-indexing format. This summary omits these glosses on the

---

[3] Local Rule 56 requires parties at summary judgment to supply brief, numbered statements of facts, supported by citations to admissible evidence. It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," *CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008), and prevents litigants from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." *Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 219 (1st Cir. 2007). The rule "permits the district court to treat the moving party's statement of facts as uncontested" when not properly opposed, and litigants ignore it "at their peril." *Id.*

record; any sufficiently-developed disputes about the legal significance of record facts are addressed in this opinion's discussion section.

### International's Academic Offerings and Title IV Participation

According to the sworn statement of Edgar Morales, a member of International's board, "[n]early all of International's students qualified for and received Title IV grant funds[,] and paid a substantial percentage of their tuition with those grant funds." R. 689. International "offered non-degree diploma programs in the fields of allied health, business, technology[,] and cosmetology[,] and offered associate degree programs in the fields of allied health and business." R. 690. According to an unexecuted affidavit from Rafael A. del Coro, a former professor of accounting at International,  the college had "many" students who took individual Saturday-only courses, labeled "Cursos Sabatinos" or "Continuous Education." R. 719. Del Coro states that students who were not in an associate-degree or diploma program on a half-time or higher basis were tracked using ledger cards with "a generic program name that was similar to, but not identical to, the program in which they were taking classes." R. 720. According to the affidavit of Ruben Luna, International's former financial aid director and interim president, "[s]ome" Saturday-course students would take more than one course in a program. R. 725.

International participated in Title IV federal loan and grant programs until 1999, after which it only participated in grant programs. R. 690. International had "provisional certification" for Title IV programs from September 12, 2002 through March 31, 2005. *See* R. 235, 1058–69. In a section titled "Reasons and Special Conditions of Provisional Certification," the certification recites that International's "official cohort default rate" for the Federal Family Education Loan program was over twenty-five percent during one or more of the preceding three fiscal years. R. 1059. International duly sought recertification of its provisional participation, and the Department extended the program participation agreement on a month-to-month basis. *See* R. 235.

**FY 2005 Financial Statements; Transfer to "Heightened Cash Monitoring 2"**

In International's audited financial statements for the fiscal year ending June 30, 2005 ("FY 2005"), filed with the Department in early May 2006, the auditor included a note titled "Compliance with 90/10 Rule." R. 355. In it, the auditor stated that International "received $2,078,320 of Title IV funds, [and] total eligible cash receipts of $2,300,716, resulting in a percentage of 90%." R. 579.

On May 8, 2006, the Department notified International that it was being placed on the "Heightened Cash Monitoring 2" ("HCM2") method of payment. R. 741. Citing 20 U.S.C. § 1226a-1 and 34 C.F.R. § 668.162, the Department explained that it was doing so because International failed to receive more than 10 percent of revenue from non-Title IV sources. *Id.* Morales asserts, without any more specificity, that after this time, International "was not paid all Title IV funds that had been earned by its students." R. 689. Luna likewise claims that International "was paid very little in Title IV funds" following the switch to HCM2. R. 724. Morales and his business instead loaned about $1.5 million to International. R. 689.

That same day, International's auditor wrote to the Department and explained that it had erroneously included $17,171.17 of Work Study funds in its formula, and that Title IV funds added up to only 90.26 percent of International's revenue for FY 2005. The accountant added that "in accordance to [*sic*] rounding rules, a 90.26% ratio rounds out to 90%," and that he understood International to have met the 90-10 Rule. R. 586.

The auditor reviewed International's receipts and provided a revised attestation dated June 14, 2006. R. 589–95. The report stated that Title IV funds used for institutional charges totaled $2,061,148.34 and that total revenues generated "from Institutional charges and necessary activities of programs" totaled $2,296,453.58, yielding a ratio of 89.75 percent. R. 593. The auditor explained that $12,843.36 in cash receipts had been mistakenly omitted from the first financial statement. R. 592.

By June 30, 2006, there were 413 students enrolled at International. R. 1140.

In August 2006, one of the Department's Financial Analysts, Michael Frola, performed an on-site review of International's records, examining the files of 55 students who had made some of the largest total cash payments to International.  R. 1407.  Of those students, 34 took Saturday-only courses, for which they typically paid either $420 or $520.  R. 1408.  These students' payments were made out-of-pocket, and without Title IV aid.  Frola found that these payments were included in the auditor's calculations.  In total, receipts from the 34 Saturday-only students added up to $15,789.  R. 1409.  Frola calculated that excluding these students' payments, International's Title IV ratio was 90.34 percent.  *Id.*

### Denial of Recertification Application

On November 8, 2006, the Department issued a letter to International titled "Denial of Recertification Application to Participate in the Federal Student Financial Assistance Programs."   R. 235–39.   Citing 34 C.F.R.  §§ 668.13 and 668.26, the Department found that International was ineligible to participate in Title IV grants after June 30, 2005 because (1) International derived more than 90 percent of its revenue from Title IV funds during FY 2005, and (2) it failed to timely submit required compliance audit reports and financial statements.  The denial letter recited the following grounds for its findings:

- International's compliance audit report and audited financial statements for FY 2004 were due December 31, 2004, but were not filed until November 18, 2005.  R. 236.

- International's compliance audit report and audited financial statements for FY 2005 were due December 31, 2005, but were not filed until May 2, 2006.  R. 236.

- The FY 2005 financial statements reported $2,078,320 in "[n]et cash received from Title IV funds," and $2,300,716 in "[n]et cash received from all eligible programs," and stated that this ratio was 90 percent.  R. 237.

- The Department reviewed the auditor's work papers and calculated a ratio of 90.23 percent.  *Id.*

- On May 25, 2006, International's auditor notified the Department that he would audit "100 percent of all cash receipts" for FY 2005 and provide a new 90-10 Rule calculation.  *Id.*

- On June 15, 2006, International's auditor identified $12,843 in additional cash payments during FY 2005.  The revised report concluded that the FY 2005 90-10 Rule was met with a ratio of $2,061,148 / $2,296,453, or 89.75 percent.  *Id.*

- The Department conducted an on-site review in August 2006 and concluded that "[m]any" of the cash payments were for non-Title-IV-eligible Saturday short classes.  Estimating "conservatively," the Department calculated that 25 percent of International's cash receipts came from the Saturday courses.  *Id.*

The Department concluded that International "failed to demonstrate its ability to exhibit proper administrative capability and trustworthiness as a fiduciary, and failed to meet the standards of financial responsibility."  *Id.*  The Department denied International's recertification to participate in Title IV programs, and requested end-of-participation reports and a closeout audit report.  R. 238.

International responded with a letter to the Department dated November 28, 2006. R. 241–47.  In the letter, International "agree[d] that its 2004 and 2005 audits were filed late and that its fiscal 2005 Title IV revenue exceeded 90.0% of all of its relevant tuition revenue," but argued that "extenuating circumstances and corrective actions" justified recertification.  R. 241.  Regarding the late audits, International explained that (1) it had taken measures to ensure timely audit reports in the future, and (2) it believed that the Department had already accepted other remedial measures as having cured the problem. R. 242.  Regarding the 90-10 Rule, International "agree[d] that it received more than 90.0% of its tuition revenues in fiscal 2005 from Title IV programs," but attributed the violation to "an unfortunate clerical error" in its FY 2005 application for a grant program

operated by the Puerto Rico government.  R. 243–44.  International offered three proposals to "remedy" the 90-10 Rule violation:  (1) repay $128,320 (plus interest and a penalty), immediately to the Department and retroactively characterize the corresponding payments to students as "institutional grants," remaining eligible for FY 2006; (2) repay $864,000 (plus interest and a penalty) to the Department over time, discounting that sum from both the Title IV revenue and total revenue for FY 2005's 90-10 Rule calculation, and thereby remaining eligible for FY 2006; or (3) repay all Title IV funds received during FY 2006—$1,407,351.09—over five years, be deemed ineligible for FY 2006, but be admitted retroactively to Title IV grants for FY 2007.  R. 244–46.

The Department responded in a letter to International in December 2006.  R. 252–54.  The Department refused to alter its prior denial of International's recertification, and extended the time for International to file end-of-participation reports by 45 days.  *Id.* Regarding the late audits, the letter reasserted that as a fiduciary, International was "ultimately responsible for the timely submission of its audits," and "failed in this responsibility."  R. 253.  However, the Department's letter did not address International's contention that the Department had previously deemed the audit deficiencies to be cured. As for the 90-10 Rule violations, the Department expressly rejected International's first two proposals, finding "no legal basis" for retroactively adjusting a past year's 90-10 ratio.  *Id.*  The Department noted that the third proposal "identif[ied] the correct basis for measuring the liability," and advised International that the Department must both calculate the FY 2006 liability *and* be repaid before it would consider International's application for Title IV participation.  *Id.*  The letter additionally advised International that in the course of a re-application, the Department would review International's FY 2003 and 2004 audits for 90-10 Rule compliance.  R. 253–54.

International closed in "late December 2006," following management's consideration of the Department's letter.  R. 689, 696.  By this time, International still owed "around $500,000" on the Morales-affiliated loans.  R. 689.

*The Advancer Purchase Offer*

Meanwhile, in November 2006, Morales reached out to the president of Advancer Local Development Corporation ("Advancer") and asked her to consider buying International.   On January 11, 2007, the president of Advancer sent a letter to International's Board of Directors titled "Offer to Acquire Assets of International Junior College."   R. 258–59.   Advancer proposed to buy International's assets and repay $1,407,351 to the Department on behalf of International, over an extended time period. The offer was conditioned on all relevant regulatory approval of the sale and the re-certification of International's Title IV eligibility.   The letter outlined a four-stage process for the transaction:   (1) International's shareholders would first unanimously adopt a resolution approving the sale; (2) Advancer would then negotiate a repayment agreement with the Department conditioned on Title IV re-certification; (3) at the same time the repayment agreement is executed, International would apply for Title IV re-certification, and Advancer would then formally purchase International's assets and apply for a change of ownership with the Department; and (4) the Department's approval of the Title IV re-certification, approval of the change of ownership, consent from educational regulators, and consent from International's contractual partners would conclude the purchase.   R. 259.

On February 2, 2007, the Department sent a letter to International's counsel, responding to two e-mails he sent about Advancer's offer.[4]   R. 283–84.   The response

---

[4] Although International admitted the Secretary's Local Rule 56 statement describing the e-mails, *see* Docket No. 65, ¶ 57 and Docket No. 72 at 11, the e-mails themselves have been inexplicably omitted from the administrative record or any formal supplement.   Rather, the Secretary provided the e-mails in an exhibit to a discovery motion.   But while the parties agreed to a limited supplementation of the original record, *see* Docket Nos. 36 and 38, there is no indication that these e-mails were part of that agreement.   In light of the presumption against taking new evidence in the district court, I find that the motion exhibit should not be considered part of the record. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *accord* Docket No. 54 (denying International's efforts to obtain discovery) and Docket No. 71 (denying International's untimely request to amend the record).   And since even unopposed statements of fact must be supported by

purportedly "identifie[d] some threshold requirements that Advancer would need to consider and accept before the Department [would] allocate staff to the significant tasks that would be required" to review the transaction.  R. 283.  For instance, the Department said that a buyer "must assume all liabilities of that school if the school continues to participate in the federal student aid programs," but added that it had not yet determined International's total liabilities.  The letter said more specifically that the Department would need to review FY 2003 and FY 2004 audit workpapers for 90-10 Rule compliance.  The letter further noted that International's FY 2006 compliance audit and financial statements indicated 90-10 Rule compliance, but that "a more detailed review is required," which would take between "several weeks" to "more than two months." R. 284.  Finally, the letter stated that "Advancer would have to accept a transitional reporting requirement" to demonstrate International's "compliance with the 90-10 Rule for one additional year under Advancer's non-profit ownership," and that the Department would examine any contracts for ongoing services between Advancer and International's outgoing owners.  *Id.*  The Department concluded by saying that if Advancer provided a written acceptance of these terms it would "prioritize the staff review of the International audit submissions."  *Id.*

In response, International's counsel e-mailed three Department officials—William Swift, Michael Frola (who had previously conducted the site visit at International's offices), and Steve Finley—on May 2, 2007, essentially (1) asking the Department to quickly finish any review of International's potential for FY 2003 and 2004 90-10 Rule violations, and (2) arguing that the Department should not require Advancer, as a non-profit, to comply with the 90-10 Rule following purchase.  R. 286–88.

International's counsel again e-mailed Finley on June 1, 2007, referring to a telephone conversation with Frola about the FY 2003 and 2004 audits.  R. 289.

---

admissible evidence, the Secretary's statement about the e-mails will not be deemed admitted. *See* Local Rule 56(e).

According to the e-mail, Frola was "able to confirm that the auditors did not count any short-term course revenue . . . in the 90-10 calculations for these fiscal years," and had passed the review results on to Finley.  *Id.*  International's counsel requested that the Department advise Advancer of whether its offer was acceptable to the Department as soon as possible.  *Id.*

On August 15, 2007, Advancer withdrew its offer, citing the lack of any response from the Department regarding additional liability.  R. 291–92, 706–07.

### *Final Audit Determination*

On August 20, 2007, the Department issued a Final Audit Determination ("FAD"), finding International ineligible for Title IV participation between July 1, 2005 and June 30, 2006.  R. 19–26.  Citing 20 U.S.C. § 1002(b)(1)(F) and 34 C.F.R. § 600.5(a)(8), the Department found that International derived more than 90 percent of its revenue from Title IV funds during the previous fiscal year.  R. 21.  The FAD recited the following events in support of the finding:

- International's initial financial statement for FY 2005 reflected a ratio of 90.33 percent.

- The Department's review of International's audit papers calculated a ratio of 90.23 percent.

- International's revised audit for FY 2005 calculated a ratio of 89.75 percent.

- The Department's on-site review revealed that the revised ratio included income from International's Saturday courses (Cursos Sabatinos).  "[E]stimating conservatively," the Department calculated that 25 percent of International's cash receipts came from the Saturday courses.  The Department considered these courses ineligible for Title IV participation and thus income from those courses were excluded from the calculation of total revenues.

- International's second revised calculation for FY 2005, excluding receipts from the Saturday courses, yielded a ratio of 93.9 percent.

R. 21–22.  The Department concluded that International owed a liability of $1,365,078 in principal and interest, for funds that International received but was not eligible for in FY 2006.  *See* R. 23.

In October 2007, International's counsel appealed the FAD and requested a hearing.  R. 7–17.  International's exhibits to the appeal included an FY 2006 audited financial statement and compliance audit.  *See* R. 298–324; 1131–45.  A hearing was held before an Administrative Judge in August 2008, and a transcript was produced.  R. 1608–93.  On September 24, 2008, an Administrative Judge for the Department rendered a decision ordering International to pay $1,365,078.  R. 1694–1701.  International appealed to the Secretary.  R. 1703–26.  On November 25, 2009, the Secretary remanded the case "for fact-finding on whether [International]'s 34 students [taking only Saturday courses] were enrolled in one of the institution's Title IV-eligible programs."  R. 1750.  On remand, the Administrative Judge again ordered International to pay $1,365,078, finding that International failed to prove the students were enrolled in a Title IV-eligible program.  R. 1833–34.  International appealed to the Secretary on August 7, 2010.  R. 1836–48.

The Secretary's final decision, dated November 19, 2010, affirmed the Administrative Judge's finding of a 90-10 Rule violation, and ordered repayment.  R. 1886–90.  According to the Secretary, International in this second appeal conceded that it violated the 90-10 Rule, but pressed two other grounds for relief from the liability.  R. 1886–87.  The Secretary rejected International's first argument that it should have been afforded the same relief given to another institution in *Gibson Barber & Beauty College*, No. 05-49-SA (Decision of the Sec'y, Nov. 25, 2009) (*Gibson Barber II*).  R. 1888–89.  The Secretary also rejected International's request for offset determinations as outside the scope of the pending proceeding.  R. 1889–90.

## DISCUSSION

International's four causes of action challenge the Secretary's interpretation of the 90-10 Rule, the Secretary's decision not to relieve International from the Final Audit

Determination, the Secretary's decision not to readmit International to Title IV programs, and the Secretary's failure to respond to International's requests for clarification of its outstanding Title IV liabilities when it was contemplating a sale.   I begin with a brief overview of the statutory and regulatory framework, then consider each motion for summary judgment as to each cause of action.   I accept both sides' expressed agreement that this case should be evaluated under the statutes and regulations in force between 2005 and 2008, and the implication that no material changes occurred during that time. *See* Def. Mem. at 3 n.2; Pl. Mem. at 3 n.1.

## I.      The 90-10 Rule

Under the applicable statute, a Title-IV-eligible "proprietary institution of higher education" (for-profit institution) was required to have "at least 10 percent of the school's revenues from sources that are not derived from funds provided under [Title IV], as determined in accordance with regulations prescribed by the Secretary."   20 U.S.C. § 1002(b)(1)(F).

Citing this statute, the Department's regulations provided that:

(a) A proprietary institution of higher education is an educational institution that—

    . . .

    (8) Has no more than 90 percent of its revenues derived from title IV, HEA program funds, as determined under paragraph (d) of this section.

    . . .

(d)(1) An institution satisfies the requirement contained in paragraph (a)(8) of this section by examining its revenues under the following formula for its latest complete fiscal year:

    Title IV, HEA program funds the institution used to satisfy its students' tuition, fees, and other institutional charges to students

    [divided by]

> The sum of revenues including title IV, HEA program funds generated by the institution from: tuition, fees, and other institutional charges *for students enrolled in eligible programs* as defined in 34 CFR 668.8; and activities conducted by the institution, to the extent not included in tuition, fees, and other institutional charges, that are necessary for the education or training of *its students who are enrolled in those eligible programs*.
>
> (2) An institution must use the cash basis of accounting when calculating the amount of title IV, HEA program funds in the numerator and the total amount of revenue generated by the institution in the denominator of the fraction contained in paragraph (d)(1) of this section.

34 C.F.R. § 600.5 (2009) (emphasis added).

Congress passed the 90-10 Rule (originally 85-15) to ensure the quality of Title IV programs. *Career Coll. Ass'n v. Riley*, 70 F.3d 637, 638 (D.C. Cir. 1995). The rule lessens for-profit institutions' reliance on federal funds, and places some pressure on them to compete for students through the quality of their education, rather than their ability to provide federal financial aid. *Ponce Paramedical Coll., Inc. v. U.S. Dep't of Educ.*, 858 F.Supp. 303, 307, 311 (D.P.R. 1994) ("The intent of the statute, as seen from Representative Water's statements on the floor of the House . . . was to reduce proprietary institutions' absolute reliance on federal funds").

## II.     Interpretation of 90-10 Rule

International challenges the Secretary's interpretation and implementation of the 90-10 Rule as being inconsistent with the plain meaning of the statute. International first argues that the term "revenues from sources that are not derived from funds provided under [Title IV]" (the denominator in the 90-10 formula), 20 U.S.C. § 1002(b)(1)(F), is unambiguous, and thus the Secretary's interpretation, as announced in a final rule, 34 C.F.R. § 600.5(d)(1), should be accorded no deference. Alternatively, International argues that the 34 students taking Cursos Sabatinos should be deemed enrolled in eligible programs, such that their cash payments constitute revenues from Title-IV-eligible programs. I will examine the two arguments in turn.

International Junior College of Business and Technology, Inc. v. Duncan, Civil No. 11-2257 (BJM)          15

### A.    Definition of Revenues

The Department's implementation of the 90-10 Rule defines "revenues" to include only those funds generated from students enrolled in Title-IV-eligible programs. § 600.5(d)(1).  Revenues from non-Title-IV eligible programs, or from non-Title-IV-related activities, are generally excluded from the 90-10 calculation.  *Id.*

In evaluating a federal agency's interpretation of a statute it administers, courts follow the two-step *Chevron* analysis.  First, the court "must determine 'whether Congress has directly spoken to the precise question at issue,'" and if so, "'give effect to the unambiguously expressed intent of Congress.'"  *City of Arlington, Tex.*, 133 S. Ct. at 1868 (quoting *Chevron*, 467 U.S. at 842–43).  But if "the statute is silent or ambiguous" on the matter, then the court need only determine "whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  Where "Congress has explicitly left a gap for the agency to fill," and the agency's interpretation is promulgated through notice-and-comment rulemaking, the court must give substantial deference to the agency's interpretation, and its regulation will be overturned only if "arbitrary, capricious, or manifestly contrary to the statute."  *Id.* at 843–44; *Succar v. Ashcroft*, 394 F.3d 8, 23 (1st Cir. 2005).

Here, Congress did not directly speak to the question at issue.  Rather, Congress explicitly left a gap and delegated authority to the Secretary to interpret and implement the 90-10 Rule, when it stated that the definition of "revenues from [non-Title-IV sources]" would be "determined in accordance with regulations proscribed by the Secretary." § 1002(b)(1)(F).  International's arguments to the contrary are not persuasive. The statutory language plainly shows that Congress intended the Secretary to further define the meaning of "revenues from sources that are not derived from funds provided under [Title IV]."  *Id.*  If Congress did not so intend, the phrase "as determined in accordance with regulations proscribed by the Secretary" would be superfluous.  *Corley v. United States*, 556 U.S. 303, 314 (2009) (noting that statutes "should be construed so

that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant"). Moreover, the remarks made by members of Congress that International cites do not alter this conclusion—first, because the statements cited are all post-enactment statements not necessarily reflective of original intent, *Bruesewitz v. Wyeth LLC*, 131 S. Ct. 1068, 1081, (2011) ("Post-enactment legislative history . . . is not a legitimate tool of statutory interpretation"), and second, because the very expression of congressional disapproval and debate tends to show the *lack* of an unambiguous definition of non-Title-IV revenues.[5]

Additionally, International's interpretation of "revenues" cannot be squared with the intended purpose of the 90-10 Rule. Under its reading, all non-Title-IV payments collected by a given institution may be included in the calculation of non-Title-IV revenue, regardless of the source. Pl. Mem. at 21. Taken to its logical extreme, if an institution operates a beauty salon on school premises to provide training opportunities to its students, and that salon also happens to sell a large selection of beauty products, revenues derived from the sale of those beauty products could count as non-Title-IV revenues, simply because they are revenues collected by the institution from non-Title-IV sources. The parties do not dispute that the purpose of § 1002(b)(1)(F) is to ensure the quality of Title IV-eligible programs, by requiring that at least 10% of the programs is actually paid for by enrolled students or other non-federal funds. The idea is that programs that can successfully compete in the marketplace for some paying students or garner related financial support are likely of sufficient quality and thus deserving of Title-IV assistance. But if the program is supported solely by Title IV funds and revenues from

---

[5] International's contention that Congress, in codifying the definition of "revenue" in 2008, indicated its disapproval of the Secretary's interpretation is also unavailing. Congress's codification in 2008, like the other statements cited by International, constitutes post-enactment legislative action not indicative of original intent. More importantly, and contrary to International's conclusory allegation, the 2008 codification does *not* clearly deviate from the Secretary's interpretation such that International's revenues from Cursos Sabatinos would count towards the denominator of the 90-10 Rule.

the sale of beauty products, there is no indication that the program is of such quality that students who attend the school would be willing in fact to pay for that education out of their own pockets.  Therefore, International's contention that the meaning of "revenues" unambiguously includes revenues from Cursos Sabatinos cannot be sustained.  *See also Ponce Paramedical Coll.*, 858 F.Supp. at 311 (finding Congress "explicitly delegated to the Department of Education the authority" to define what constitutes non-Title-IV revenues).

Because Congress in the organic statute has not directly spoken to the meaning of "revenues," step two of *Chevron* requires the court to determine whether the agency's interpretation is a reasonable one entitled to deference.  I find, as other courts have found, that the Secretary's definition of non-Title-IV revenues, as promulgated in 34 C.F.R. § 600.5, is a permissible interpretation of the organic statute.  *See Career Coll. Ass'n*, 70 F.3d at 638; *Ponce Paramedical Coll.*, 858 F.Supp. at 312.  As discussed above, the purpose of the 90-10 Rule is to ensure Title IV eligibility extends only to those institutions who provide quality Title IV programs.  It is reasonable for the Secretary to limit the definition of "revenues" to tuitions, fees, and payments directly related to students' enrollment in Title IV programs.   Were the definition of revenues to include tuitions and fees from non-Title-IV programs, or funds derived from non-educational services, the efficacy of the 90-10 Rule would be diminished or defeated.  Thus, I find that the Secretary's definition of "revenues" under § 1002(b)(1)(F) is a reasonable interpretation and must be upheld.

### B.    Students Enrolled in Eligible Programs

International also challenges the Secretary's determination that revenues from the 34 students enrolled in Cursos Sabatinos were revenues from *ineligible* programs, which are excluded from the denominator of the 90-10 ratio.   International argues that the decision is contrary to agency precedent and unsupported by the evidence.

Under the Secretary's regulations, only payments for "students enrolled in eligible programs" may be included in the denominator of the 90-10 fraction. 34 C.F.R. § 600.5(d)(1). For a program to be deemed Title IV eligible, the program must include at least 15 weeks of instruction and be at least 600 clock hours, 16 semester or trimester hours, or 24 quarter hours. § 668.8(d). The Secretary contends that enrollment in a course that is creditable towards an eligible program, i.e. one that could count towards satisfaction of program requirements, is insufficient by itself to establish enrollment in an eligible program such that the student's payments would be included in the total revenues figure for the 90-10 Rule. The Secretary's interpretation of its own regulations is entitled to "controlling weight" unless "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ.* 512 U.S. at 512.

International contends that the Secretary's interpretation must be rejected as being inconsistent with *Sinclair Community College*, No. 89-21-S, 75 Educ. Law Rep. 1296 (Decision of the Sec'y, Sept. 26, 1991), in which the Secretary affirmed an Administrative Judge's finding that a certain number of students were enrolled in Title-IV-eligible programs. As the Secretary points out, however, the *Sinclair* case had nothing to do with the 90-10 Rule and there is no indication that *Sinclair* involved students taking weekly Saturday courses. Def. Opp. at 11. The decision, does, however, list some of the documents an institution can submit to show student enrollment in an eligible program. *See id.* (evidence of degree or certificate completion at the institution, or transfer to a four-year institution; class records showing the students were enrolled for purposes of obtaining eligible degrees or certificates).

International further argues that the Secretary's decision is entitled to no deference because the Administrative Judge and the Secretary ignored key evidence (certain school officials' affidavits and the school's course catalogue in Spanish), and failed to cross reference the course catalogue with the 34 students' records to determine that they were taking courses *creditable* towards eligible programs. But even assuming the Secretary

should have found that the 34 students were enrolled in creditable courses, there is no legal authority for International's proposition that mere enrollment in a creditable course is sufficient evidence of enrollment in an eligible program.  Moreover, International does not assert that the 34 students were directly enrolled in eligible programs.  Therefore, it cannot be said that the Secretary's decision to exclude revenues from the 34 Cursos Sabatinos students is arbitrary, capricious, or an abuse of discretion.  International's first claim fails, and the Secretary is entitled to judgment as a matter of law.

## III.    Affirmance of Final Audit Determination

International next challenges the Secretary's refusal to forgive its 90-10 Rule violation and affirmance of the Final Audit Determination, in which the Department determined International violated the 90-10 Rule for FY 2005 and was liable for $1,365,078.

The Secretary of Education is charged with conducting "program reviews" of all participating institutions of higher education.  20 U.S.C. § 1099c-1(a).  Reviews result in the issuance of a Final Audit Determination, in which the Department identifies violations or liabilities "based on an audit of . . . [a]n institution's participation in any or all of the Title IV, HEA programs."  34 C.F.R. § 668.112(a).  An institution may seek administrative review of a Final Audit Determination and present certain types of evidence.  § 668.113(a)–(c).  In the course of such reviews, the Secretary must, among other safeguards, "permit the institution to correct or cure an administrative, accounting, or recordkeeping error if the error is not part of a pattern of error and there is no evidence of fraud or misconduct related to that error."  20 U.S.C. § 1099c-1(b)(3).  To this end, the regulations provide that the Secretary "permits the institution to correct or cure" an "administrative, accounting, or recordkeeping error" if both (1) there was no "pattern of error," and (2) "there is no evidence of fraud or misconduct related to the error."  34 C.F.R. § 668.113(d)(1).  Importantly, the Secretary has defined an action that "cures or corrects that error" to be one that "eliminates the basis for the liability."  § 668.113(d)(2).

In *Gibson Barber II*, the Secretary relieved an institution's liability for violating the 90-10 Rule.  That institution's FY 2002 90-10 ratio was 92 percent, exceeding the 90 percent threshold by $3,850.  *Gibson Barber II*, slip op. at 1.  The institution's liability from that violation was $186,958.  During FY 2002, the institution's owner donated[6] $3,850 with the intent to bring it into 90-10 Rule compliance.  *Id.*  The administrative judge found that this gift could not be counted as revenue, and affirmed a liability of $186,958.  *Id.* at 1–2.  The Secretary affirmed the finding that the 90-10 Rule had been violated, but nonetheless decided that the liability should be forgiven.  He identified § 668.113(d) as an example of his "authority to accept an institution's corrective measures in the administration of Title IV funds," but qualified that reference:

> Notably, I do not hold as a general matter that violations of the 90/10 rule are to be considered administrative errors or that such violations are always subject to the extraordinary remedial exceptions of section 668.113(d).  Rather, this decision stands for the limited proposition that under circumstances that I deem applicable, I may exercise my authority to accept a corrective action of an isolated regulatory violation that eliminates the basis of liability and where the record reveals that there is no evidence of fraud and no allegation of a pattern of errors by the institution.

*Id.* at 2 n.6.  The Secretary found "three extraordinary factors" justifying forgiveness of the liability:  (1) the "conspicuously small amount of money" by which the institution failed the 90-10 test; (2) the absence of allegations of fraud or a recent pattern of similar violations; and (3) "the absence of *any* allegation of regulatory violation aside from the failure to meet the 90/10 rule."  *Id.* at 2–3 (emphasis in original).  Based on those factors, the Secretary deemed the donation to be a corrective measure "eliminat[ing] the basis for liability in this proceeding."  *Id.* at 3.  In sum, the statutory and regulatory framework provides that errors will be forgiven by a "cure or correction" that "eliminates the basis for the liability."  34 C.F.R. § 668.113(d)(2); 20 U.S.C. § 1099c-1(b)(3).  In *Gibson*

---

[6] The donation was initially meant to be a loan, but the owner subsequently "converted the unpaid balance of the loan to a donation."  *Gibson Barber II*, slip op. at 1 n.2.

*Barber II*, the Secretary concluded that the statutory mandate and accompanying regulation gave him authority to grant relief in light of the case's "notable circumstances." *See* slip op. at 2.

Here, International contends that "the Secretary had a statutory duty to permit International to cure its error" and that it demonstrated the same "notable circumstances" found in *Gibson Barber II*, triggering the Secretary's obligation to forgive its 90-10 violation. *See* Pl. Mem. at 7–16. To succeed on this claim, International must show that the Secretary's refusal to grant relief in accordance with the statutory/regulatory scheme and *Gibson Barber II* was arbitrary and capricious. *Craker*, 714 F.3d at 26. Agency action is invalid if inconsistent with well-established agency precedent and its departure was unexplained. *See Shaw's Supermarkets, Inc. v. NLRB.*, 884 F.2d 34, 36 (1st Cir. 1989).

International challenges the Secretary's refusal to grant relief primarily on three grounds. First, it argues that the Secretary failed to adequately explain his departure from *Gibson Barber II*, because like the institution there, it exceeded the 90-10 Rule by an exceedingly small amount, especially in contrast to its FAD liability, and there is no evidence or allegation of fraud or other regulatory violations aside from the 90-10 Rule violation. Second, International asserts that the Secretary's interpretation of "a pattern of error" in § 668.113(d) to require "the lack of *any* regulatory violation," R. 1888, is "unsupported by the plain language of the regulation." Third and finally, International contends that the Secretary improperly ignored evidence of International's corrective actions, including a $500,000 "forgiven" loan made by one of International's owners, and International's offer in November 2006 to repay the amount of 90-10 overage. International's second argument is inapposite, since the Secretary did not base his decision on a finding that International violated any other regulations. International's first and third arguments are related and are addressed together.

The Secretary in his decision did distinguish International from the institution in *Gibson Barber II*, finding that International (1) exceeded the 90-10 ratio by "at least twice as much" as the institution in *Gibson Barber II*, (2) was placed on a more stringent payment process called Heightened Cash Monitoring 2 ("HCM2"), and (3) never "adopted corrective measures that would eliminate the basis for liability." R. 1889. With respect to the first finding, the Secretary noted that the exact amount by which International exceeded the 90-10 Rule in FY 2005 is unknown, but it ranges between $8,599.69 and $61,139.32. *Id.* International argues that the Secretary unfairly examined the amount exceeded only in absolute terms, and that *Gibson Barber II* requires the Secretary to evaluate its 90-10 overage in relation to the total amount of liability imposed. International rightly points out that the Secretary in *Gibson Barber II* examined that institution's 90-10 overage relative to its liability, Slip op. at 1 ("I am convinced that requiring [Gibson Barber] to repay $186,958 because [the institution] exceeded the 90/10 calculation by $3,850 is not in accord with [Gibson Barber's] effort to execute corrective measures"); whereas here, the Secretary did not consider the extent of International's 90-10 violation in relation to the resulting FAD liability. Nevertheless, the Secretary on the whole adequately distinguished International's circumstances from those in *Gibson Barber II*.

First, in *Gibson Barber II*, the exact amount exceeded—$3,850—was not in dispute. Here, given the numerous calculations submitted by both International and the Department,[7] the Secretary was prudent in concluding that the exact amount exceeded is

---

[7] International criticizes the Department's failure to adopt a specific 90-10 ratio in this case. The record includes at least five different 90-10 calculations, each with slightly different revenue figures. International's original audit report filed in May 2006 shows a 90-10 ratio of 90.33%. R. 217. The Department's initial review of International's audit papers concluded the ratio is 90.23%. R. 22. International's revised audit calculations in June 2006 state a ratio of 89.75%. R. 231. In a November 2006 letter to the Department, International admitted that its 90-10 ratio was in fact 93.9%. R. 243. And in its second appeal to the Secretary, International claims that it exceeded the 90-10 Rule by $8,599.69, with a ratio of 90.34%. R. 1868 n. 5.

unknown, that International differed from the institution in *Gibson Barber II,* and that it cannot be stated with certainty that International exceeded the 90-10 Rule by a conspicuously small amount of money.  The Secretary's second basis for his decision, the HCM2 status, although not evidence of fraud or a regulatory violation, further supports his reasoning for distinguishing International's circumstances from *Gibson Barber II*.

Moreover, International's failure to take corrective measures further supported the Secretary's decision to depart from *Gibson Barber II*.  One of International's owners had loaned money to the school, around $500,000 of which was never repaid but subsequently "forgiven."  International claims that this "forgiven" loan should be deemed a cure for its 90-10 violation, much as Gibson Barber and Beauty College was deemed to have cured its liability by means of a forgiven-loan-turned donation.  But in *Gibson Barber II*, the loan was advanced during the *same* fiscal year as the 90-10 Rule violation, whereas here the $500,000 loan was given during FY 2006 to keep the school afloat.  The Secretary, however, did fail to mention that International in November 2006 offered to pay back certain amounts to remediate its FY 2005 90-10 violation.   R. 244–46.  International's offer to repay is arguably similar to the cure in *Gibson Barber II*, with the important distinction, however, that International offered to pay back any 90-10 overage only after the Department formally denied International's Title-IV recertification.   At bottom, unlike Gibson Barber and Beauty College, International never attempted to cure its error during FY 2005, the year of its 90-10 violation.

The Secretary also properly rejected other "corrective actions" allegedly taken by International.  A cure must eliminate the basis for the liability—here, International's 90-10 Rule violation in FY 2005.   In *Gibson Barber II*, the Secretary deemed that institution's donation eliminated the basis for its liability because the donation, made in the year of the violation, was intended to bring the school directly in compliance with the 90-10 Rule.  The owner there intended the donation to be included in the FY 2005 90-10 ratio.  In contrast, International's receipt of Puerto Rico grant funds in FY 2006 cannot

affect its FY 2005 90-10 Rule calculations.  34 C.F.R. § 600.5(d)(2) ("An institution must use the cash basis of accounting when calculating . . . the total amount of revenue generated by the institution in the denominator of the [90-10] fraction").  And similarly, the proposed sale to Advancer in 2007 does nothing to directly remediate the FY 2005 violation.  Therefore, these two actions were not corrective measures for purposes of § 668.113(d).

For the above reasons, plaintiffs' second cause of action must be dismissed.

## IV.    Denial of Readmission to Title IV

International next asserts that the Department's denial of its Title IV recertification application was arbitrary, capricious, and an abuse of discretion.

The Department's determination of an institution's Title IV eligibility constitutes an informal adjudication subject to judicial review as set out in the APA.  *See Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 777 (1st Cir. 2000).  Such determinations will be upheld so long as they are not arbitrary, capricious, or an abuse of discretion.  *Id.*; 5 U.S.C. § 706(2)(A).  When considering an application for participation in Title IV programs, the Secretary must evaluate whether the institution is financially responsible, possesses administrative capability, is capable of acting as the Department's fiduciary, and whether the school "otherwise . . . lack[s] the ability to administer" Title IV programs competently.  34 C.F.R. §§ 668.15(a); 668.16; 668.82; 668.16(n).

In a letter to International dated November 8, 2006, the Department formally denied International's Title IV recertification application, citing three reasons: (1) its FY 2004 compliance audit report was submitted 11 months after its due date; (2) its FY 2005 compliance audit report was four months late; and (3) International failed to meet the 90-10 Rule for FY 2005.  R. 235–37.  International responded to the Department's rejection in late November, conceding the late audits and 90-10 Rule violation and offering three proposals to re-gain Title IV eligibility.  R. 241–53.  The first two proposals involved International repaying a portion of its liability to "erase" its FY 2005 90-10 Rule

violation and to retain its Title IV eligibility as if no violation had occurred.  R. 244–46.
International's third proposal would require it to pay back all amounts drawn and
disbursed during FY 2006 (when it was clearly ineligible) over a five year period,
provided that the Department retroactively approve its Title IV application for FY 2007
and beyond.  R. 246.  The Department rejected International's proposals and reaffirmed
its decision in late December 2006.  R. 252–54.

On this record, no evidence supports International's claim that the Department's
decision was arbitrary, capricious, or an abuse of discretion.   On the contrary, the
Department acted rationally in denying International's recertification application.  At the
time, International in its response admitted to the factual basis underlying the
determination—it acknowledged the 90-10 Rule violation and its failure to timely submit
compliance audits for the past two years.  R. 242–43.  The Department also was not
obligated to accept International's proposals—paying back a portion of its liability, or
executing a five-year payment plan in conjunction with International receiving retroactive
eligibility.  Under the circumstances before it, the Department could rationally conclude
that International was incapable of adequately serving as the Department's fiduciary
because it had evidence that International misstated its compliance with the 90-10 Rule
for FY 2005, and was significantly tardy in submitting its annual compliance audits for
FY 2004 and FY 2005.  *Cf.  Instituto de Educacion Universal Corp. v. Riley*, 973 F.Supp.
95, 97 (D.P.R. 1997) (affirming the Department's denial of a Title IV application for a
new campus where the institution committed "serious" violations at an existing campus).
Although the Department's refusal to negotiate with International may be harsh, it is not
arbitrary, capricious, or an abuse of discretion.   Accordingly, this claim must be
dismissed.

### V.      The Advancer Purchase Offer

Finally, International argues that the Department's inaction with respect to International's repeated requests for an estimate of its total liabilities was arbitrary, capricious, and an abuse of discretion.

Under Section 498 of the 1992 Amendments to the Higher Education Act, "an eligible institution of higher education" that undergoes a change in ownership and control must re-establish its eligibility to participate in Title IV programs.   20 U.S.C. § 1099c(i)(1).   The statute's implementing regulation requires the after-acquired institution to reapply for Title IV eligibility with the Department.   34 C.F.R. § 600.31.   Such an application is evaluated for all appropriate indicia of competency and capability as any other new institution applying for Title IV participation.  *See* § 600.31(a)(3)(ii).

In early January 2007, Advancer signed a letter of intent to purchase International. R. 258–59.   International subsequently informed the Department of this purchase plan. On February 2, 2007, the Department responded, explaining that one condition to Advancer receiving Title-IV eligibility would be to assume all of International's liabilities, including those yet unknown.   R. 283–84.   The letter explained that the Department would have to review International's audit reports from FY 2003 and FY 2004 to determine whether any 90-10 Rule violations and resulting liabilities accrued from those years. R. 283.   The letter also provided that if Advancer formally accepted the various terms set out in the letter, "the Department will then prioritize the staff review of the International audit submissions."   R. 284.   In subsequent emails, International protested the conditions stated in the Department's letter and requested that the Department promptly conduct its review of International's 2003 and 2004 audit papers and advise as to whether International may be liable for any additional amounts.  R. 286–88.  The Department did not respond, and Advancer withdrew its offer in August 2007. R. 291–92, 706–07.

The Department's failure to respond to International's final inquiry may be unfortunate, but it was not contrary to the law.  International cites no statute or regulation that imposes a duty on the Department to respond to its inquiries.  International and Advancer had good reason to pause when the Department informed them that Advancer would have to take on any and all potential liabilities.  But it is not incumbent on the Department to provide International and Advancer with immediate assurances that no other liabilities would result from prior year violations of the 90-10 Rule.  International and Advancer presumably had the very same audit workpapers that the Department had; and the two organizations, in a commercial transaction, are ultimately responsible for determining the value and potential liabilities of the selling institution.  Moreover, Advancer never filed a formal application for Title IV eligibility or change of ownership with the Department.  If it had, the application would have triggered a formal review process in the Department, necessitating a formal response.  *See* 34 C.F.R. § 600.20(e).  But in the absence of such an application, the Department's inaction after International's e-mails in mid-2007 cannot be said to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A).  Therefore, the Department is entitled to summary judgment on this cause of action.

## CONCLUSION

In sum, International has failed to show that the challenged agency actions are unlawful and must be set aside.  I find there are no genuine issues of material fact and the Secretary is entitled to judgment as a matter of law.  For the foregoing reasons, The Secretary's motion for summary judgment is **GRANTED**, and International's motion for summary judgment is **DENIED**.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 20th day of September, 2013.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge